IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| LEALON M. VASSAR, <br> BRENDA N. VASSAR, <br> L. GREGORY VASSAR, <br> CHERYL F. VASSAR, <br> JOHN C. KORN, <br> and MICHAEL J. KORN, <br><br> *Plaintiffs,* <br><br> v. <br><br> DANIEL ROSS, both in his personal capacity and his official capacity as Conservation Police Officer for the Virginia Department of Game and Inland Fisheries, <br><br> and <br><br> JON HART, <br> both in his personal capacity and his official capacity as Conservation Police Officer for the Virginia Department of Game and Inland Fisheries, <br><br> *Defendants.* | **CIVIL COMPLAINT** <br><br> Civil Action No. 4:14CV00056 |

## PARTIES

1. Plaintiffs Lealon M. Vassar and Brenda N. Vassar are husband and wife, and they are residents of the Commonwealth of Virginia. They are the parents of plaintiff L. Gregory Vassar.

2. Plaintiffs L. Gregory Vassar and Cheryl F. Vassar are husband and wife, and they are residents of the Commonwealth of Virginia.

1

3. Plaintiff John C. Korn is a resident of the State of New Jersey. He is the father of plaintiff Michael J. Korn. He also is the cousin of plaintiff L. Gregory Vassar. Plaintiff Michael J. Korn, likewise, is a resident of the State of New Jersey.

4. Defendant Daniel I. Ross (hereinafter "Ross") is a resident of the State of Virginia, and he is employed as a Conservation Police Officer by the Commonwealth of Virginia, Department of Game and Inland Fisheries.

5. Defendant Jon W. Hart (hereinafter "Hart") is a resident of the State of Virginia, and he is employed as a Conservation Police Officer by the Commonwealth of Virginia, Department of Game and Inland Fisheries. Hart holds the rank of Sergeant, and he holds the position of District Supervisor.

## JURISDICTION AND VENUE

6. Count I of this action arises under the Fourth Amendment to the United States Constitution, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and the Civil Rights Act, 42 U.S.C. § 1983.

7. Accordingly, as to Count I the plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

8. As to Counts II-IV, which arise under Article I, Section 11 of the Constitution of Virginia, Virginia Code § 19.2-59, and the common law of the Commonwealth of Virginia, the plaintiffs invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a). These claims have been properly presented to the Director of the Virginia Division of Risk Management pursuant

to the Virginia Tort Claims Act, Virginia Code §§ 8.01-195.1 *et seq.* See Plaintiffs' Exhibit "A."

9. Venue is proper in the Western District of Virginia, Danville Division, because the real property and appurtenant easement of plaintiffs Lealon M. Vassar, Brenda N. Vassar, L. Gregory Vassar and Cheryl F. Vassar (collectively "the Vassars"), upon which the events giving rise to this civil action occurred, is located in Charlotte County, Virginia, within the Western District of Virginia. Moreover, the defendants herein reside in Charlotte County, in the Western District of Virginia.

## FACTS

10. The Vassars are the owners of a certain tract or parcel of real estate located in Charlotte County, Virginia, and which is described as follows:

> All of that certain tract or parcel of land, lying and being in Roanoke District, Charlotte County, Virginia, previously containing 970.48 acres, more or less, as shown on a plat of survey by R. B. Cartwright, C.L.S., dated August 10, 1970, revised September 4, 1984, and recorded in the Clerk's Office for the Circuit Court of Charlotte County, Virginia, but now LESS AND EXCEPT that lot or parcel of land containing 1.55 acres, more or less, that was conveyed to the Commonwealth of Virginia by deed dated September 29, 1997, and recorded in the aforesaid Clerk's Office in Deed Book 294, at page 303, for improvements to State Secondary Route Route 636, and further LESS AND EXCEPT that tract or parcel of land containing 98 acres, more or less, that was conveyed to Stanley Land and Lumber Corporation by deed dated March 24, 1999, and recorded in the aforesaid Clerk's Office in Deed Book 303, at page 758.
>
> This BEING the same identical tract or parcel of land that was conveyed to Lealon M. Vassar and Brenda N. Vassar, husband and wife, as tenants by the entirety, a one-half interest, and to L. Gregory Vassar and Cheryl F. Vassar,

>husband and wife, as tenants by the entirety, a one-half interest, by Special Warranty Deed dated May 10, 2004, from Hawaii ERS Timberland LLC, and recorded on May 24, 2004, in the aforesaid Clerk's Office in Deed Book 349, at page 527, and identified as "PARCEL ONE" in said deed.

In this Complaint, the owners of this parcel of real estate shall be referred to as the "Vassars," and the parcel itself shall be referred to as the "Roxabel Tract."

11. At all pertinent times, the Roxabel Tract had "No trespassing" signs posted in various readily visible places.

12. The north side of the Roxabel tract may be accessed from State Secondary Route 619 (Chandlers Forks Road), and the south side of the Roxabel Tract may be accessed from State Secondary Route 645 by means of an easement along an existing dirt road.

13. Across the easement to State Secondary Route 645, the Vassars had constructed a locked cable gate that controlled access to, and prevented unauthorized vehicles from entering onto, the Roxobel Tract. A wooden post was placed in the ground on either side of the dirt road, and a steel cable was stretched across the road. The cable was permanently looped on the one side, and it was secured by a lock on the other.

14. Over time, the Vassars realized that unauthorized vehicles could trespass onto their property by driving around the gate. Accordingly, they constructed an additional barrier by nailing a wooden two-by-four stud from one of the posts to a tree stump.

15. On November 16, 2012, Conservation Officer Daniel Ross ("Ross") parked his motor vehicle near the Roxobel Tract on Chandlers Forks Road, exited his vehicle, and knowingly and intentionally crossed over the boundary

4

line of the Roxobel Tract on foot. He did not have a warrant to search the property, he had no knowledge of any search warrant having been issued for the property, and he lacked probable cause to believe that criminal activity was occurring on the property. However, he walked about and otherwise remained on the Roxobel Tract for several hours.

16. That same day the Korns, having been licensed to do so and having received permission from the Vassars, entered onto the Roxobel Tract for the purpose of hunting deer. On the day in question, licensed hunters were permitted to hunt deer with black powder rifles. Each of the Korns was armed accordingly with a black powder rifle.

17. During the time of Ross's occupation of the Roxobel Tract, he concealed himself from the Korns, using binoculars to observe them. Ross did not observe any criminal activity being undertaken by the Korns.

18. Ross then left the Roxobel Tract and called Hart at his residence, informing him that he had observed individuals on the Roxobel tract. Ross did not indicate that he had observed any criminal activity by said individuals, yet he still asked Hart to come to the property to assist him.

19. Although Hart was not in his uniform, he left his residence and met Ross at the Roxobel Tract. After discussing the matter they decided to continue observing the individuals on the property from different vantage points, using binoculars.

20. Sometime thereafter, at about 4:30 p.m., Hart and Ross heard the discharge of a firearm. Though the discharge was a black powder shot, Hart and

Ross maintained that the shot sounded like a rifle shot – not sincerely, but as a pretext for entering onto the Roxabel Tract.

21. Sunset on that day was at about 5:00 p.m. Hart and Ross then drove along State Route 645, to the south entrance to the Roxabel Tract in an official motor vehicle, arriving at such entrance at or about 5:45 p.m. They had heard no other discharges of a firearm other than the single shot they had heard at about 4:30 p.m.

22. Hart and Ross then entered onto the Roxobel Tract in the official motor vehicle. They took note of the locked cable gate across the entrance to the Roxabel Tract from State Route No. 645, observed the pine stump to the right of the gate, with the board affixed, and ripped the stump out of the ground, taking the board with it. They then drove through the space they had created in the barrier, entered onto the Roxobel Tract with the vehicle, and headed towards the direction of the shot they had heard.

23. After Hart and Ross drove a short distance onto the property, they observed an unoccupied pickup truck and an unoccupied tree stand. They cut the lights to their vehicle off and observed flashlights at a distance. Hart and Ross then parked their vehicle, blocking the road in such a manner that the individuals could not use the unoccupied pickup truck to leave the Roxobel Tract. Hart and Ross exited their vehicle, concealed themselves in the brush, and waited for the individuals to return to the pickup truck. They did not identify themselves or announce their presence at that time.

24. As the John C. Korn and Michael Korn ("the Korns") walked up to their pickup truck, Hart and Ross abruptly turned on their flashlights, revealed their presence and announced their position as Conservation Police Officers – effectively ambushing the Korns. Ross and Hart had their badges and weapons displayed from the initial contact with the Korns, and throughout the encounter. Ross and Hart took the Korns' hunting licenses to check them, effectively taking physical custody of the Korns at that point.

25. The Korns were not free to leave, and the Korns did not consent to the encounter.

26. Ross began interrogating the Korns about their identity and their activities on the Roxobel Tract. The Korns identified themselves, and John Korn explained that he had been in a deer stand during the late afternoon and had taken a single shot at a buck with his black powder rifle. John Korn explained that he realized that the buck did not drop where it had been hit, and that he and his son met where the pickup truck was parked and then went looking for the animal. John Korn explained that although they found a clump of hair, they did not find any blood and they did not discover the animal. Lastly, John Korn explained to Ross that he was somewhat physically limited by a bad knee.

27. Despite receiving this information from John Korn, Ross compelled the Korns to walk with the officers to show them where the deer stand was, where the deer had been, and where they had found the clump of hair. The Korns complied with all of Ross's instructions while they were being compelled to walk, in the dark, across the Roxobel Tract.

28. Ross and Hart then escorted the Korns back to the pickup truck and demanded to see the weapon that had been discharged. John Korn explained that the weapon, still loaded, was inside the pickup truck. Ross took possession of the weapon, sniffed it, and unloaded it. Ross then reassembled the weapon incorrectly by placing the breach plug in upside down.

29. Hart and Ross next took a few steps away from the Korns, directing the Korns to remain in place. The officers briefly whispered between themselves, and then demanded to inspect John Korn's personal hunting pouch. Before John Korn produced it, Ross brusquely grabbed thfe pouch, unsuccessfully attempting to wrench it from John Korn's grip. John Korn then opened the pouch and displayed its contents to Ross.

30. Hart and Ross then ordered the Korns to remain stationary at a nearby position while the officers searched their pickup truck.

31. The nonconsensual custodial encounter took over an hour. The officers discovered no evidence of any criminal activity by the Korns, and the officers issued no criminal charges or citations against the Korns.

32. Hart and Ross then informed the Korns that they were free to leave. John Korn asked the officers whether he or his son had done anything wrong; the officers replied, "No." At that point, Hart, Ross, and the Korns all left the Roxobel Tract.

## COUNT I: 42 U.S.C. § 1983
## DEFENDANTS ROSS AND HART VIOLATED THE PLAINTIFFS' FEDERALLY-PROTECTED RIGHT TO BE SECURE AGAINST UNREASONABLE SEARCHES AND SEIZURES

33. The allegations of paragraphs 1 through 32, *supra*, are incorporated herein by this reference.

34. The defendants consistently exceeded their discretion and authority as Conservation Officers, and violated the plaintiffs' constititutional rights to be secure against unreasonable searches and seizures, in taking the following actions:

(a) Entering upon the Roxobel Tract without a warrant and/or probable cause;

(b) Destroying the gate the Vassars had constructed across the entrance to the south side of the Roxobel Tract, with neither warrant to enter the property nor probable cause to believe that any violation of Virginia laws had been committed there;

(c) Spying on the Korns, and then ambushing them, with neither a warrant for their arrest, nor probable cause to believe that either of them had violated any Virginia laws, nor reasonable suspicion that either of them presented any danger;

(d) Demanding that the Korns remain with them, and walk significant portions of the Roxabel Tract with them in the dark;

(e) Searching the Korns' weapons, pouch, and pickup truck, with neither warrant nor probable cause, nor reasonable suspicion of danger, and not incident to any lawful arrest.

9

35. The defendants, at all relevant times, acted under color of state law.

36. The defendants acted willfully and maliciously, and with reckless or callous indifference to the plaintiffs' federally protected rights. Therefore, punitive damages are appropriate in this case.

WHEREFORE, as to Count I, the plaintiffs demand the following relief:

(a) Judgment against the defendants in their personal capacities, jointly and severally, in the amount of Two Hundred Thousand Dollars ($200,000.00), which demand comprises a demand for compensatory damages of One Hundred Fifty Thousand Dollars ($150,000) and punitive damages of Fifty Thousand Dollars ($50,000.00);

(b) Their costs expended in this cause, and reasonable attorney's fees as provided by 42 U.S.C. § 1983;

(c) That the defendants, in their personal and official capacities, be enjoined from entering onto the real property of the Vassars without probable cause or warrant, and from committing acts that damage any part of the Roxobel Tract, or which violate the constitutional rights of any persons hunting there;

(d) All such further and general relief as this Court deems proper.

**COUNT II: THE DEFENDANTS VIOLATED ARTICLE 1, SECTION 11 OF THE CONSTITUTION OF VIRGINIA AND VIRGINIA CODE § 19.2-59**

37. The allegations of paragraphs 1 through 37, *supra*, are incorporated herein by this reference.

38. In the present case, none of the defendants' entries onto the Vassars' property, nor the search thereof by the defendants, nor the destruction the the Vassars' gate, nor the search of the Korns' weapons, pouch or vehicle, was been made pursuant to a "warrant issued by a proper officer," and the defendants' actions exceeded their authority under Virginia Code §§ 19.2-59 and § 29.1-208.

39. The defendants acted willfully and maliciously, and with reckless or callous indifference to the plaintiffs' rights under Virginia law. Therefore, punitive damages are appropriate in this case.

WHEREFORE, as to Count II, the plaintiffs demand the following relief:

(a) Judgment against the defendants, jointly and severally, in the amount of One Hundred Thousand Dollars ($100,000.00), which demand comprises a demand for compensatory damages of Seventy-Five Thousand Dollars ($75,000.00) and punitive damages of Twenty-Five Thousand Dollars ($25,000.00);

(b) That the defendants be enjoined from entering onto the real property of the Vassars without probable cause or warrant, and from committing acts that damage any part of the Roxobel Tract, or which violate the Virginia constitutional and statutory rights of any persons hunting there;

(c) All such further and general relief as this Court deems proper.

## COUNT III: FALSE IMPRISONMENT

40. The allegations of paragraphs 1 through 39, *supra*, are incorporated herein by this reference.

41. By their actions, the defendants intentionally detained Michael and John Korn without authority of law.

42. In falsely imprisoning the Korns the defendants acted willfully and maliciously, and with reckless or callous indifference to the Korns' rights. Therefore, punitive damages are appropriate in this case.

WHEREFORE, as to Count III, plaintiffs John Korn and Michael Korn demand judgment against the defendants, in their personal capacities, jointly and severally, in the amount of One Hundred Thousand Dollars ($100,000.00), which amount comprises compensatory damages in the amount of Seventy-Five Thousand Dollars ($75,000.00) and punitive damages in the amount of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT IV: TRESPASS AND DESTRUCTION OF PROPERTY

43. The allegations of paragraphs 1 through 42, *supra*, are incorporated herein by this reference.

44. By taking action that exceeded their authority as Conservation Officers, the defendants intentionally trespassed upon the Vassars' property and damaged it intentionally.

45. In destroying the Vassars' property, the defendants acted willfully and maliciously, and with reckless or callous indifference to the Korns' rights. Therefore, punitive damages are appropriate in this case.

WHEREFORE, as to Count IV, the plaintiffs Vassar demand judgment against the defendants, in their personal capacities, jointly and severally, in the amount of Seventy-Five Thousand Dollars ($75,000.00), which amount comprises compensatory damages in the amount of Fifty Thousand Dollars ($50,000.00) and punitive damages in the amount of Twenty-Five Thousand Dollars ($25,000.00).

WHEREFORE, having pleaded their cause in the foregoing four counts, the plaintiffs demand the following relief:

(a) Judgment against the defendants, in their personal capacities, jointly and severally, in the total amount of Four Hundred and Seventy-Five Thousand Dollars ($475,000.00);

(b) Their costs and reasonable attorney's fees expended in this cause;

(c) That the defendants, in their personal and official capacities, be enjoined from entering onto the real property of the Vassars without probable cause or warrant, and from committing acts that damage any part of the Roxobel Tract, or which violate the constitutional rights of any persons hunting there;

(d) All such further and general relief as this Court deems proper.

### JURY DEMAND

The plaintiffs demand a jury trial for all claims triable by a jury.

                                        LEALON M. VASSAR,
                                        BRENDA N. VASSAR,
                                        L. GREGORY VASSAR,
                                        CHERYL F. VASSAR,
                                        JOHN C. KORN,
                                        MICHAEL J. KORN

                                        By: _____
                                                        Of Counsel

Dated: November 14, 2014

By: _____
Michael John Brickhill, Esquire (VSB # 35781)
michael@mjbpc.net
David Paul Mitchel, Esquire (VSB # 48583)
david@mjbpc.net
MICHAEL J. BRICKHILL, P.C.
Post Office Box 2218
1890 Church Street
Appomattox, Virginia 24522
Telephone: (434) 352-0699
Facsimile: (434) 352-0066
Counsel for the plaintiffs

14