# MICHAEL J. BRICKHILL, P.C.
### A PROFESSIONAL LAW CORPORATION

*Please respond to Appomattox Office:*
POST OFFICE BOX 2218
1890 CHURCH STREET
APPOMATTOX, VIRGINIA 24522

MICHAEL J. BRICKHILL, ESQUIRE
DAVID P. MITCHEL, ESQUIRE

TELEPHONE (434) 352-0699
FACSIMILE (434) 352-0066

November 15, 2013

Mr. Don LeMond, Director
Division of Risk Management
James Monroe Building, Third Floor
101 North 14th Street
Richmond, Virginia 23219

**HAND-DELIVERED ON NOVEMBER 15, 2013**

### NOTICE OF CLAIMS UNDER VIRGINIA TORT CLAIMS ACT, VIRGINIA CODE §§ 8.01-195.1 ET SEQ.

Dear Mr. LeMond:

By this letter we are providing notice of claims against the Commonwealth of Virginia pursuant to the Virginia Tort Claims Act, Virginia Code §§ 8.01-195.1 *et seq.*

### I. CLAIMANTS

The claimants are Lealon M. Vassar, Brenda N. Vassar, L. Gregory Vassar, Cheryl F. Vassar, John C. Korn, and Michael J. Korn. The Vassars are residents of the Commonwealth of Virginia, and the Korns are residents of the State of New Jersey. They are represented in this matter by Michael J. Brickhill, Esquire and David P. Mitchel, Esquire, of the law firm Michael J. Brickhill, P.C.

### II. AGENCIES LIABLE

The agency liable is the Commonwealth of Virginia, Department of Game and Inland Fisheries. The liable officers are Daniel Ross, a Conservation Police Officer, and Sgt. John Hart, a Conservation Police Officer and District Supervisor.

### III. DATE OF INJURIES

The date upon which the injuries in question occurred is November 16, 2012.

### IV. PLACE OF INJURIES

The place of the injuries is a parcel of real property of roughly 900 acres located in the Roanoke Magisterial District of Charlotte County, Virginia, adjoining State Route Nos. 619, 645, and 636. The real estate is particularly described as follows:

> All of that certain tract or parcel of land, lying and being in Roanoke District, Charlotte County, Virginia, previously

**MICHAEL J. BRICKHILL, P.C.**
A PROFESSIONAL LAW CORPORATION

Letter to Mr. Don LeMond, Director
Commonwealth of Virginia Division of Risk Management
November 15, 2013
Page 2

> containing 970.48 acres, more or less, as shown on a plat of survey by R. B. Cartwright, C.L.S., dated August 10, 1970, revised September 4, 1984, and recorded in the Clerk's Office for the Circuit Court of Charlotte County, Virginia, but now LESS AND EXCEPT that lot or parcel of land containing 1.55 acres, more or less, that was conveyed to the Commonwealth of Virginia by deed dated September 29, 1997, and recorded in the aforesaid Clerk's Office in Deed Book 294, at page 303, for improvements to State Secondary Route Route 636, and further LESS AND EXCEPT that tract or parcel of land containing 98 acres, more or less, that was conveyed to Stanley Land and Lumber Corporation by deed dated March 24, 1999, and recorded in the aforesaid Clerk's Office in Deed Book 303, at page 758.
>
> This BEING the same identical tract or parcel of land that was conveyed to Lealon M. Vassar and Brenda N. Vassar, husband and wife, as tenants by the entirety, a one-half interest, and to L. Gregory Vassar and Cheryl F. Vassar, husband and wife, as tenants by the entirety, a one-half interest, by Special Warranty Deed dated May 10, 2004, from Hawaii ERS Timberland LLC, and recorded on May 24, 2004, in the aforesaid Clerk's Office in Deed Book 349, at page 527, and identified as "PARCEL ONE" in said deed.

In this Notice, the owners of such parcel shall be referred to as the "Vassars," and the parcel itself shall be referred to as the "Roxobel Tract."

The gate which Officer Ross and Sgt. Hart removed to enter onto the Roxobel Tract in their vehicle was located across a deeded right-of-way between the Roxobel Tract and State Route No. 645.

### V.    STATEMENT OF FACTS GIVING RISE TO CLAIMS

On November 16, 2012, Conservation Officer Daniel Ross ("Ross") parked his motor vehicle near the Roxobel Tract, exited his vehicle, and knowingly and intentionally crossed over the boundary line of the Roxobel Tract on foot. He did not have a warrant to search the property, he had no knowledge of any search warrant having been issued for the property, and he lacked probable cause to believe that criminal activity was occurring on the property. However, he traversed and otherwise remained on the Roxobel Tract for several hours.

During the time of Ross' trespass, the Korns, having received permission from the Vassars, entered onto the Roxobel Tract for the purpose of hunting

**MICHAEL J. BRICKHILL, P.C.**
A PROFESSIONAL LAW CORPORATION

PLAINTIFFS'
EXHIBIT "A"

Letter to Mr. Don LeMond, Director
Commonwealth of Virginia Division of Risk Management
November 15, 2013
Page 3

deer. On the day in question, licensed hunters were permitted to hunt deer with black powder rifles, and each of the Korns was armed with a black powder rifle.

During the time of Ross' occupation of the Roxobel Tract, he concealed his presence on the property from the Korns, and he used binoculars to observe them. Ross did not observe any criminal activity being undertaken by the Korns. Ross then left the Roxobel Tract and called Sgt. John Hart ("Hart") at his residence, informing him that he had observed individuals on the Roxobel tract. He did not indicate that he had observed any criminal activity by said individuals, yet he still asked Hart to come to the property to assist him.

Although Hart was not in his uniform, he left his residence and met Ross at the Roxobel Tract. They had a discussion and decided to continue observing the individuals on the property from different vantage points, using binoculars. Sometime thereafter, at or about 4:30 p.m., Hart and Ross heard the audible discharge of a firearm. Using their radios, they discussed the discharge of a firearm they had heard. Hart and Ross conspired and intentionally created the false opinion that the discharge they heard sounded like a rifle shot, not a black powder shot.

Sunset on that day was at or about 5:00 p.m. Hart and Ross then drove to the Chandlers Fork Road entrance to the Roxabel Tract, arriving at such entrance approximately 45 minutes after sunset, or at or about 5:45 p.m. They heard no other discharges of a firearm other than the single shot they had heard at about 4:30 p.m.

Hart and Ross then entered onto the Roxobel Tract in an official motor vehicle. They took note of a locked cable gate across the entrance to the Roxabel Tract from State Route No. 645, observed the pine stump to the right of the gate, with the board affixed, and ripped the stump out of the ground, taking the board with it.[1] They then drove through the space they had created in the barrier, entered onto the Roxobel Tract with the vehicle, and headed towards the direction of the shot they had heard.

After Hart and Ross drove a short distance onto the property, they observed an unoccupied pickup truck and an unoccupied tree stand. They cut the lights to their vehicle off and observed flashlights at a distance. Hart and Ross then parked their vehicle, blocking the road in such a manner that the individuals could not use the unoccupied pickup truck to leave the Roxobel Tract. Hart and Ross exited their vehicle, concealed themselves in the brush, and waited for the

---

[1] The Vassars had constructed the locked cable gate that controlled access to, and prevented unauthorized vehicles from entering onto, the Roxobel Tract. A wooden post was placed in the ground on either side of the dirt road, and a steel cable was stretched across the roadway. The cable was permanently affixed to one post, and it was secured by a lock on the other. Over time, the Vassars realized that unauthorized vehicles could trespass onto their property by driving around the gate on one side. Accordingly, they constructed a barrier on that side by nailing a wooden board to a tree stump, which stump was affixed to the real estate.

**MICHAEL J. BRICKHILL, P.C.**
A PROFESSIONAL LAW CORPORATION

Letter to Mr. Don LeMond, Director
Commonwealth of Virginia Division of Risk Management
November 15, 2013
Page 4

individuals to return to the pickup truck. They did not identify themselves or announce their presence at that time.

As the Korns walked up to the pickup truck, Hart and Ross abruptly turned on their flashlights, revealed their presence, announced their position as Conservation Police Officers, and surprised the Korns. Ross and Hart had their badges and weapons displayed from the initial contact with the Korns, and throughout the encounter. Ross and Hart took the Korns' hunting licenses to check them, effectively taking physical custody of the Korns at that point. The Korns were not free to leave, and the Korns did not consent to the encounter.

Ross began interrogating the Korns about their identity and their activities on the Roxobel Tract. The Korns identified themselves, and John Korn explained that he had been in a deer stand during the late afternoon and had taken a single shot at a buck with his black powder rifle. John Korn explained that he realized that the buck did not drop where it had been hit, and that he and his son met where the pickup truck was parked and then went looking for the animal. John Korn explained that although they found a clump of hair, they did not find any blood and they did not discover the animal. Lastly, John Korn explained to Ross that he was somewhat physically limited by a bad knee.

Despite this information from John Korn, Ross compelled the Korns to walk with the officers to personally show them where the deer stand was, where the deer had been, and where they found the clump of hair. The Korns complied with all of Ross's instructions while they were being compelled to walk, in the dark, across the Roxobel Tract.

Ross and Hart then escorted the Korns back to the pickup truck and demanded to see the weapon that had been discharged. John Korn explained that the weapon, still loaded, was inside the pickup truck. Ross took possession of the weapon, sniffed it, and unloaded it. Ross then reassembled the weapon incorrectly by placing the breach plug in upside down.

Hart and Ross next took a few steps away from the Korns, directing the Korns to remain in place. The officers whispered for a short period of time, and then came back to the Korns, demanding to inspect John Korn's personal hunting pouch. As John Korn began to produce and open the pouch, Ross grabbed the pouch in a violent manner and unsuccessfully attempted to wrench it from John Korn's grip. John Korn opened the pouch and displayed its contents to Ross.

Hart and Ross then directed the Korns to remain stationary at a nearby position, and the officers searched the pickup truck.

The nonconsensual custodial encounter took over an hour. The officers discovered no evidence of any criminal activity by the Korns and no criminal charges or citations were issued by the officers against the Korns.

**MICHAEL J. BRICKHILL, P.C.**
A PROFESSIONAL LAW CORPORATION

Letter to Mr. Don LeMond, Director
Commonwealth of Virginia Division of Risk Management
November 15, 2013
Page 5

Hart and Ross then informed the Korns that they were free to leave. John Korn asked the officers whether he or his son had done anything wrong, and the officers replied, "No." At that point, Hart, Ross, and the Korns all left the Roxobel Tract.

### VI. NATURE OF CLAIMS

The foregoing facts give rise to the following claims against the Commonwealth, its agencies and agents/employees:

1. Trespass upon the Vassars' real property;

2. Negligent and intentional injuries to the Vassars' real property and the improvements thereon, in violation of common law and Article 1, § 11 of the Constitution of Virginia;

3. False imprisonment of the Korns;

4. Violation of the Korns' rights under the Fourth Amendment to the Constitution of the United States, Article 1, § 11 of the Constitution of Virginia, and Virginia Code § 19.2-59.

The Vassars collectively demand damages in the total amount of **$75,000.00** for their claims of trespass upon and damage to their real property.

John C. Korn demands damages in the total amount of **$100,000.00, or the maximum limit of any liability policy, whichever is greater,** exclusive of interest and costs. This claim shall be in addition to any damages claim which John C. Korn may raise pursuant to 42 U.S.C. § 1983.

Michael J. Korn demands damages in the total amount of **$100,000.00, or the maximum limit of any liability policy, whichever is greater,** exclusive of interest and costs. This claim shall be in addition to any damages claim which John C. Korn may raise pursuant to 42 U.S.C. § 1983.

Sincerely yours,

MICHAEL J. BRICKHILL, P.C.
A PROFESSIONAL LAW CORPORATION

By: _____
David P. Mitchel, Esquire
Associate



## ACKNOWLEDGEMENT OF DELIVERY

    In accordance with § 8.01-195.6, Code of Virginia, this acknowledges that one or more documents were hand-delivered to the Department of the Treasury, Division of Risk Management (DRM) on the date stamped hereon. The original of this signed and dated acknowledgement was given to the person making the delivery and a copy of this acknowledgement was attached to the document(s) delivered. The delivered documents will be retained by DRM for whatever legal effect they may have on operations conducted by DRM. However, the delivery of documents to DRM does not imply that further action will be taken by DRM with respect to the subject matter of the documents.

    DRM personnel and other personnel at the Department of the Treasury are prohibited from providing legal advice or guidance regarding claims against the Commonwealth of Virginia. Various legal remedies may be available and parties wishing to pursue such claims may wish to consult with a private attorney to protect their legal rights.

Rosana Sheldon
Authorized Signature