IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| LEALON M. VASSAR, BRENDA N. VASSAR, L. GREGORY VASSAR, CHERYL F. VASSAR, JOHN C. KORN, and MICHAEL J. KORN, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DANIEL ROSS and JON HART, | ) ) |
| Defendants. | ) ) |

Case No. 4:14-cv-00056

**MEMORANDUM OPINION**

By: Hon. Jackson L. Kiser
     Senior United States District Judge

Before me is Defendants Daniel Ross and Jon Hart's Motion to Dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("the Motion").[1] The Motion was filed on April 6, 2015. [ECF No. 8.] Plaintiffs filed a timely response [ECF No. 13], Defendants replied [ECF No. 14], and I heard oral arguments on the Motion on June 8, 2015. For the reasons stated herein, I will grant the Motion in part. Specifically, the claims relating to the search of the Roxobel tract and the destruction of the fence will be dismissed. Likewise, the claim for trespass will be dismissed for lack of jurisdiction. The remaining claims survive.

I.  **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**[2]

Plaintiffs Lealon Vassar and Brenda Vassar are husband and wife. (Compl. ¶ 1 ECF No. 1].) Their son, Plaintiff L. Gregory Vassar, is married to Plaintiff Cheryl Vassar. (Id. ¶ 1–2.) Together, the Vassars own a tract of land in Charlotte County, Virginia, known as the "Roxobel Tract." (Id. ¶ 10.) Plaintiff John Korn is Gregory Vassar's cousin, and John Korn's son is

---

[1] Defendants also moved for dismissal under Fed. R. Civ. P. 12(b)(1), but Plaintiffs have withdrawn the portions of their Complaint that Defendants contend should be dismissed under this Rule.

[2] The facts are taken from Plaintiff's Complaint. As this stage, it is appropriate to accept Plaintiff's factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Plaintiff Michael J. Korn. (Id. ¶ 3.) The Korns are residents of New Jersey, while the Vassars are all residents of Virginia. (Id. ¶¶ 1–3.)

Defendants Daniel Ross and Jon Hart are both Conservation Police Officers with the Commonwealth of Virginia Department of Game and Inland Fisheries. (Id. ¶¶ 4–5.) Defendant Hart holds the rank of Sergeant and District Supervisor. (Id. ¶ 5.)

The Vassars secured the Roxobel tract by placing wooden posts on either side of the dirt road that provided access to the property and stretching a steel cable across the road. (Id. ¶ 13.) "No Trespassing" signs were posted in readily visible places on the land. (Id. ¶ 11.) When the Vassars discovered that the parcel could be accessed by driving around the posts and steel cable, they constructed an additional barrier by nailing a wooden two-by-four to one post and a nearby tree stump. (Id. ¶ 14.)

On November 16, 2012, Defendant Ross parked his car near the Roxobel tract and entered the property on foot. He did not have a warrant and, at that time, had no suspicion that a crime had been committed on the property. (Id. ¶ 15.) Nevertheless, he walked around the Roxobel tract for several hours. (Id.)

That same day, the Korns were on the Roxobel tract hunting deer. (Id. ¶ 16.) They had the Vassars's permission to hunt on the land. (Id.) On the day in question, the law permitted hunters to hunt with black powder rifles only, and the Korns were armed accordingly. (Id.) While the Korns were hunting, Plaintiffs allege that Ross "concealed himself from the Korns, using binoculars to observe them. Ross did not observe any criminal activity undertaken by the Korns." (Id. ¶ 17.)

After observing the Korns for a period of time, Ross left the Roxobel tract and phoned Hart at his home. (Id. ¶ 18.) Ross asked Hart to come to the Roxobel tract and assist him,

- 2 -

Case 4:14-cv-00056-JLK-RSB   Document 19   Filed 06/15/15   Page 2 of 20   Pageid#: 136

despite the fact that he had not observed any illegal activity. (Id.) Hart was not in uniform, but met Ross at the Roxobel tract. (Id. ¶19.) After discussing the matter, they decided to continue observing the Korns with binoculars from various, hidden vantage points. (Id.)

Shortly after 4:30 p.m., Ross and Hart heard a gun discharge. (Id. ¶ 20.) Although the shot was from the Korns black powder rifle, Ross and Hart claim that it sounded like a rifle shot, which was not permitted for hunting on that day. (Id.) Plaintiffs assert that this belief was not sincere, but rather was a pretext for entering the Roxobel tract. (Id.)

Ross and Hart drove their vehicles to the entrance to the Roxobel tract (the one blocked by a steel cable), arriving at approximately 5:45 p.m. (Id. ¶ 21.) Because the steel cable was locked in place, Ross and Hart removed the tree stump from the ground, taking the wooden two-by-four along with it. (Id. ¶ 22.) They accessed the property through the opening they created in the barrier to the Roxobel tract, and headed in the direction in which they heard the gunshot. (Id.)

Ross and Hart eventually discovered the Korns's vehicle and an empty deer stand. (Id. ¶ 23.) They parked their vehicle in such a manner as to block the Korns from being able to drive off the property, exited their vehicles, observed flashlights in the distance, secreted themselves in the nearby brush, and waited for the Korns to return to their vehicle. (Id.) As the Korns approached their truck, Ross and Hart turned on their flashlights, revealed their presence, and identified themselves as Conservation Police Officers. (Id. ¶ 24.) Plaintiffs characterize this as an "ambush." (Id.) Although only Ross was in uniform, both Ross and Hart displayed their badges and weapons during the entire encounter.[3] Ross and Hart "took" the Korns's hunting

---

[3] Although the Complaint is silent on the issue, it appears that both Ross and Hart kept their weapons holstered during the entire encounter.

- 3 -

licenses at this point, which the Korns maintain prevented them from leaving. (Id.) The Korns allege that they "were not free to leave, and [they] did not consent to the encounter." (Id. ¶ 25.)

Ross began "interrogating" the Korns about their identity and activities. (Id. ¶ 26.) John Korn explained that he and his son had been hunting, that he had taken a shot at a buck with his black powder rifle, that the buck had not fallen, and that they had proceeded to stalk the animal to discover if or where it had fallen. (Id.) John Korn explained that, although they discovered a clump of hair, they did not discover any blood or the animal's carcass. (Id.) He also pointed out that he had limited mobility because of a bad knee. (Id.)

Nevertheless, Ross "compelled" the Korns to walk with him and Hart and show the officers where the deer stand was, where the buck had been, and where the Korns had found the clump of hair. (Id. ¶ 27.) "The Korns complied with all of Ross's instructions while they were being compelled to walk, in the dark, across the Roxobel tract." (Id.)

After walking around the property, Ross and Hart escorted the Korns back to the pickup truck and "demanded" to see the weapon John Korn claimed to have discharged. (Id. ¶ 28.) John Korn explained that the weapon, which was still loaded, was inside the truck. (Id.) Ross took possession for the weapon,[4] sniffed it, and unloaded it. (Id.) Ross then incorrectly reassembled the weapon. (Id.) Ross and Hart stepped away from the Korns and spoke privately, although they directed the Korns to "remain in place." (Id. ¶ 29.) Ross and Hart demanded to see John Korn's personal hunting pouch. Before John Korn could produce, Ross attempted to grab the pouch from him, and unsuccessfully attempted to "wrench" the pouch from John Korn's hands. (Id.) John Korn opened the pouch and displayed its contents to Ross. (Id.) Ross and Hart then ordered the Korns to remain in place while they searched the pickup truck. (Id. ¶ 30.)

---

[4] It is unclear whether John Korn retrieved the weapon from the vehicle, whether he opened the truck for Ross, or whether Ross opened the truck and retrieved the weapon on his own.

- 4 -

At no point did the Korns consent to a search of their person, their belongings, or their truck. (Id. ¶ 31.) The "nonconsensual custodial encounter took over an hour." (Id.) Ross and Hart did not discover any evidence of illegal activity, and eventually told the Korns they were free to go. (Id.) Prior to leaving, John Korn asked Ross and Hart whether he and his son had done anything wrong. They replied succinctly: "No." (Id. ¶ 32.) At that point, all parties left the Roxobel tract.

Plaintiffs brought suit in this Court on November 14, 2014, pursuant 42 U.S.C. § 1983. They allege that Defendants violated their constitutional rights by: (1) entering the Roxobel tract; (2) destroying the gate; (3) spying on and ambushing the Korns; (4) demanding that the Korns remain with them and walk significant portions of the Roxobel tract in the dark; and (5) searching the Korns's weapons, hunting pouch, and pickup truck, all without a warrant, probable cause, or reasonable suspicion, and not incident to a lawful arrest. (Id. ¶ 34.) Plaintiffs also allege that Defendant violated Va. Code Ann. § 19.2-59, and committed the common-law torts of trespass and false imprisonment. (See id. ¶¶ 37–45.) Defendants filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on April 6, 2015. (Mot. to Dismiss, Apr. 6, 2015 [ECF No. 8].)[5] In response to the motion, Plaintiffs' filed a response and abandoned their request for an injunction and their allegation that Defendants violated Article I, Section 11 of the Constitution of Virginia. I heard arguments on the Motion on June 8, 2015.

## II. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

---

[5] Because Plaintiffs have abandoned their claim for an injunction, the 12(b)(1) motion is moot.

- 5 -

Iqbal, 556 U.S. at 678. In determining facial plausibility, the court must accept all factual allegations in the complaint as true. Id. The Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555 (internal quotation marks omitted). Therefore, the Complaint must "allege facts sufficient to state all the elements of [the] claim." Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003). Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

### III.  DISCUSSION

"Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution of the laws of the United States. Nevertheless, a government official sued under § 1983 is entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit itself." Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). In addition to protecting officers whose conduct does not run afoul of the Constitution, "qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

When examining a claim of qualified immunity, the Court begins by "asking whether the facts, '[t]aken in the light most favorable to the [plaintiff],' show that 'the officer's conduct violated a constitutional right.' If the answer is no, 'that ends the matter, and the officer is entitled to immunity.'" Turmon v. Jordan, 405 F.3d 202, 204-05 (4th Cir. 2005) (quoting

Saucier v. Katz, 533 U.S. 194, 201 (2001)). In determining whether a constitutional violation occurred, the facts are to be viewed in the light most favorable to the injured party—in this case, the Vassars and the Korns. See Turmon v. Jordan, 405 F.3d 202, 204-05 (4th Cir. 2005) (quoting Saucier, 533 U.S. at 201). "[I]f a violation could be made out on a favorable view of the parties' submissions, the next . . . step is to ask whether the right was clearly established" at the time of the violation. Saucier, 533 U.S. at 201; Turmon, 405 F.3d at 205. A constitutional right is "clearly established" when "its contours [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). If the right is not "clearly established," the officer is entitled to immunity. See Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012). When considering the two-step Saucier analysis, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). In the present case, Plaintiffs allege several Fourth Amendment violations. They are addressed in turn.

    A. <u>Count 1: "Entering the Roxobel tract without a warrant and/or probable cause" (Compl. ¶ 34(a))</u>[6]

Plaintiffs' first allegation of a Fourth Amendment violation is the alleged "search" of the Roxobel tract. "The Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effect. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz [v. United States]) gather information in what [the Supreme Court has] called 'open fields'—even if those fields are privately owned—because such fields are not

---

[6] This claim may only refer to the Vassars, as there is no allegation that the Korns had any property rights to the Roxobel tract.

- 7 -

enumerated in the Amendment's text." Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (citing Oliver v. United States, 466 U.S. 170, 176 (1984); Hester v. United States, 265 U.S. 57 (1924)). Therefore, it follows that, if the Roxobel tract is an "open field," it was not encompassed by the Fourth Amendment's proscription against unreasonable searches.

"The term 'open fields' is a legal term of art. For purposes of Fourth Amendment analysis, an 'open field' need not be 'open' nor a 'field' as those terms are used in common speech. An open field includes any unoccupied or undeveloped area outside of the home and its curtilage." Moher v. United States, 875 F. Supp. 2d 739, 774 (W.D. Mich. 2012). In the Complaint, the Roxobel tract is described as containing over 970 acres, and capable of being accessed from several state roads. The Complaint does not allege that a home is situated anywhere on the tract, and does not allege that the Vassars, the Korns, or any other persons reside on the Roxobel tract. See Oliver v. United States, 466 U.S. 170, 178 (1984) ("[T]he rule of Hester v. United States[, 265 U.S. 57 (1924)] . . . may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."). The Complaint is devoid of any facts which would bring the Roxobel tract within the protection of the Fourth Amendment. Therefore, "the government's intrusion upon the open fields [of the Roxobel tract] is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." Id. at 177. Accord United States v. Smith, 456 F. App'x 200, 208 (4th Cir. 2011) (per curiam) (unpublished) (holding that land was an "open field" not subject to Fourth Amendment where "[t]here is no evidence that the land was near the curtilage of the home or that there were any domestic uses for the land", and "[t]here is no indication in the record that [the owner] took meaningful steps to prevent this land from being observed".)

Although alleged in the Complaint, the presence of a fence and "No Trespassing" signs does not alter this conclusion. "The presence of gates, fences, and 'No Trespassing' signs on real property does not transform an open field into an area where there is an objectively reasonable expectation of privacy protected by the Fourth Amendment." Moher, 875 F. Supp. at 774 (collecting cases). "The rather typical presence of fences, closed or locked gates, and 'No Trespassing' signs on an otherwise open field therefore has no constitutional import." United States v. Rapanos, 115 F.3d 367, 372 (6th Cir. 1997).

Based on the facts in the Complaint, and assuming all factual allegations are true, the most that can be said is that Defendants entered into an open field and observed the Korns. This does not rise to the level of a constitutional violation sufficient to state a claim under 42 U.S.C. § 1983. "[T]here is no constitutional difference between police observations conducted while in a public place and while standing in the open fields." United States v. Dunn, 480 U.S. 294, 304 (1987). Therefore, Plaintiffs' Complaint fails to state a cause of action with respect to the search of the Roxobel tract.

> B. Count 1: "Destroying the gate the Vassars had constructed across the entrance to the . . . Roxobel tract" (Compl. ¶ 34(b))[7]

With regard to Plaintiffs' claim that Defendants' destruction of the gate impeding access to the Roxobel tract, Plaintiffs allege a claim under the Fourth Amendment. Because the Roxobel tract was an "open field," Defendants did not need a warrant or probable cause to search the land. Thus, it follows that the search, standing alone and no matter how unreasonable or lacking in probable cause, cannot justify a Fourth Amendment violation. The only way for the destruction of the gate to justify a claim under the Fourth Amendment is if the warrantless search—which was permissible—was carried out in an unreasonable manner.

---

[7] This claim may only refer to the Vassars, as there is no allegation that the Korns had any property rights to the Roxobel tract.

- 9 -

The Supreme Court has stated that "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself was lawful . . . ." United States v. Ramirez, 523 U.S. 65, 71 (1998). Under the facts alleged by Plaintiff, Defendants had no suspicion whatsoever that any illegal activity was occurring or had occurred on the Roxobel tract. Under Plaintiffs' version of the facts, Defendants heard a shot which they knew was a black powder rifle.[8] (See Compl. ¶ 20.) Over an hour later (id. ¶¶ 20–21), they decided to enter the Roxobel tract to "investigate." At that time, they had no reason to suspect any crime whatsoever. Therefore, the question is whether it was "excessive" and "unreasonable" to "destroy" the Vassars's property in the course of their search (even though the search itself was not prohibited by the Fourth Amendment) because they had no reason to search the property in the first place.

Luckily, that is a question that I do not need to answer at this stage. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) (noting that courts may address the Saucier question in either order). Unlike the search of the Roxobel tract, Defendants are entitled to qualified immunity for any Fourth Amendment violation stemming from the removal of the gate. Because Defendants were not prohibited from entering the Roxobel tract under the circumstances, the law is not "clearly established" that the officers could not remove a tree stump that was blocking their entrance. Plaintiffs have not pointed to any case where such an entry was held to violate

---

[8] Defendants' argument to avoid this allegation is lacking. Defendants argue that Plaintiffs have not shown that Defendants' belief was merely a pretext for entering the Roxobel tract ignores the standard applicable on a motion to dismiss. It is assumed, for purposes of this motion, that this allegation is true. (See Compl. ¶ 20.) No more is required. I am also unpersuaded by the argument that the allegation is merely "conclusory" and not entitled to any weight. On a motion to dismiss, all reasonable inferences must be made in favor of Plaintiffs and their allegations. The reasonable inference behind the allegation that "Ross maintained that the shot sounded like a rifle shot—not sincerely, but as a pretext for entering the Roxabel [sic] tract," is that Ross did not actually believe the shot was a rifle shot.

- 10 -

the Fourth Amendment.[9] In fact, Defendants have identified one case has held that "seizure" of a gate was not inconsistent with the Fourth Amendment. See Scott v. Garrard Cnty. Fiscal Court, 2012 U.S. Dist. LEXIS 47597, at *5–7 (E.D. Ky. April 4, 2012). As such, a reasonable officer may not have known whether the actions Defendants undertook were unconstitutional, and therefore Defendants are entitled to qualified immunity on that claim.

    C. <u>Count 1: "Spying on the Korns, and then ambushing them . . . ." (Compl. ¶ 34(c))</u>[10]

For the reasons stated above regarding the search of the Roxobel tract, Defendants did not need a warrant or probable cause to observe the Korns from their vantage point on the Roxobel tract. "[T]here is no constitutional difference between police observations conducted while in a public place and while standing in the open fields." <u>Dunn</u>, 480 U.S. at 304. Because Defendants would not have needed a warrant or probable cause to observe the Korns in a public place, they did not need one to observe the Korns in an open field. Therefore, Defendants' observations of the Korns from the Roxobel tract does not rise to the level of a Fourth Amendment violation, and Plaintiffs have failed to state a claim on this allegation.

    D. <u>Count 1: "Demanding that the Korns remain with them, and walk significant portions of the Roxobel tract with them in the dark" (Compl. ¶ 34(d))</u>[11]

Plaintiffs have alleged an unreasonable seizure in their Complaint. As Defendants accurately point out, "[a] person is seized by the police and thus entitled to challenge the

---

[9] I note that the presumed value of the "gate" is a relevant consideration, and one that weighs in Defendants' favor. Had Defendants removed the steel cable and/or pylons, or removed part of a continuous fence, this analysis may very well be different. Here, however, the question is whether the removal of a stump (which had *de minimus* value, if any at all) and two 2x4s was "unnecessary" and "excessive" in light of the scope of the search. I cannot say that a reasonable officer would *know* that removing a stump and its attached 2x4s under the circumstances was clearly an "excessive" execution of the warrantless—and permissible—search of the Roxobel tract.

[10] This claim may only refer to the Korns, as there is no allegation that the Vassars were observed or detained by Defendants at any point.

[11] This claim may only refer to the Korns, as there is no allegation that the Vassars were observed or detained by Defendants at any point.

- 11 -

government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." Brendlin v. California, 551 U.S. 249, 254 (2007) (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991) (internal quotation omitted)). There is no allegation that the Korns were detained by means of physical force. In order to determine "when a seizure occurs in response to authority, and when it does not," id. at 255, the question is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," United States v. Mendenhall, 446 U.S. 544, 554 (1980), or "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," Bostick, 501 U.S. at 435-36.

The Fourth Circuit has adopted "a number of non-exclusive factors to consider in determining whether a police-citizen encounter constitutes a seizure . . . ." Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 461 (4th Cir. 2013). They include:

> [T]he number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature."

United States v. Jones, 678 F.3d 293, 299 (4th Cir. 2012) (quoting United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989)). "'[T]he time, place, and purpose' of an encounter' is also relevant. Santos, 725 F.3d at 461 (quoting United States v. Weaver, 282 F.3d 302, 310 (4th Cir. 2002)).

Under the facts alleged in Plaintiffs' Complaint, Plaintiffs have alleged that they were seized within the meaning of the Fourth Amendment. Defendants parked their vehicle in such a

- 12 -

Case 4:14-cv-00056-JLK-RSB Document 19 Filed 06/15/15 Page 12 of 20 Pageid#: 146

manner as to block the Korns's vehicle, making egress impossible.[12] (Compl. ¶ 23.) Although there were only two officers, one was in uniform, both were displaying their badges of authority, and both were armed. (Id. ¶ 24.) The Korns assert that they did not consent to the encounter. (Id. ¶ 25.) Defendants took possession of the Korns's hunting licenses, although the Complaint does not state when (or if) the licenses were returned. (Id. ¶ 24.)[13] Plaintiffs assert that they were "compelled" to walk over the Roxobel tract, which indicates they did not have a choice in the matter. (Id. ¶ 27.) Defendant Ross then took possession of the Korns's hunting rifle, making it impossible for the Korns to leave without relinquishing their private property. (Id. ¶ 28.) Defendants then "directed" the Korns to remain in place, indicating that the Korns had no choice in the matter. (Id. ¶ 29.) Defendants then searched the truck, again making it impossible for the Korns to leave. (Id. ¶ 30.) Lastly, the Korns asked if they were "free to leave," and asked whether they had done anything wrong. (Id. ¶ 32.) Such a question strongly suggests that, up until that point, the Korns had been treated as though they were suspected of illegal activity. See Jones, 678 F.3d at 299. Assuming the facts in the Complaint are true, a reasonable person would not have believed he was free to leave or to disengage from Defendants, and thus the Korns were seized.[14]

---

[12] At oral argument, Defendants asserted that the vehicle was not visible to the Korns, and thus the Korns could not have known that they were not capable of leaving. This allegation is not in the Complaint. The Complaint states: "Hart and Ross then parked their vehicle, blocking the road in such a manner that the individuals could not use the unoccupied pickup truck to leave the Roxobel tract." (Compl. ¶ 23.) The Jones factor this addresses—"whether [the officers] attempted to block his departure . . ."—is satisfied by this allegation.

[13] Retention of the Korns's hunting licenses, by itself, is not sufficient to create a "seizure." See, e.g., United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002).

[14] Because the Complaint alleges that Defendants had *neither* probable cause *nor* reasonable suspicion that the Korns had committed a crime, it does not matter whether the seizure was an arrest, see Brown v. Illinois, 422 U.S. 590 (1984), or a Terry stop, see Terry v. Ohio, 392 U.S. 1 (1968). All that matters is that the stop was not consensual. Plaintiffs have clearly alleged that it was not. (See Compl. ¶ 25.)

- 13 -

Defendants' argument that Plaintiffs' allegations are merely conclusory is unpersuasive. While terms such as "compelled" and "directed" do indicate a conclusion, they also establish an *interpretation* of the actions that *is* relevant. On a motion to dismiss, all reasonable inferences are taken in the light most favorable to Plaintiffs. Thus, their interpretation of Defendants' actions—which underlie their factual assertions—are relevant and sufficient in the present case to defeat Defendants' motion to dismiss.

Because Plaintiffs have alleged a Fourth Amendment violation, the next question to be answered is whether Defendants are nonetheless entitled to qualified immunity. On this question, at this stage, the answer must be no. Under the facts alleged in the Complaint, Defendants had neither probable cause nor reasonable suspicion to believe that the Korns committed any violation of the law.[15] Thus, Defendants had no cause to detain the Korns, let alone for over an hour. (See Compl. ¶ 31.)

Defendants' argument that the "contours" of this right were not sufficiently established at the time is unavailing. The requirement of cause in order to detain someone is a cornerstone of the Fourth Amendment. Under these facts, a reasonable officer would have known that detaining a person for over an hour without cause violates the clear strictures of the Fourth Amendment. At this stage, Defendants are not entitled to qualified immunity.

---

[15] The Complaint also alleges that Defendant Ross observed the Korns for several hours and "did not observe any criminal activity being undertaken by the Korns." (Compl. ¶ 17.) Thus, under the allegations of the Complaint, Defendant Ross should have known that the Korns were hunting with a black powder rifle, making his seizure of the Korns completely lacking in all respects.

E. <u>Count 1: "Searching the Korns's weapons, pouch, and pickup truck" (Compl. ¶ 34(e)</u>[16]

A "search" occurs under the Fourth Amendment when "the Government obtains information by physically intruding on a constitutionally protected area . . . ." <u>United States v. Jones</u>, 132 S. Ct. 945, 950 n.3 (2012). The Fourth Amendment protects places and objects in which a person "has a reasonable expectation of privacy . . . ." <u>United States v. Castellanos</u>, 716 F.3d 828, 847 (4th Cir. 2013). The facts of the Complaint establish that Defendants searched the Korns's automobile, the Korns's gun, and John Korn's hunting pouch.

The Complaint alleges that Defendants "searched" the pickup truck. On its face, this allegation is the type that is insufficient under <u>Iqbal</u> and <u>Twombly</u>. Defendants are correct that this assertion, standing alone, is the type of conclusory allegation that will not suffice. When coupled with the allegations regarding the gun, however, it is clear that Defendants entered the truck and did not merely "peer" in. <u>See</u> <u>United States v. Smith</u>, 456 F. App'x 200, 208 (4th Cir. 2011) (holding that agent's "shining of a flashlight into the open gap in the rubber stripping of [a] tractor trailer" did not violate the Fourth Amendment because "[p]olice officers do not conduct a search . . . when, stationed in a place where they have a right to be, they observe objects in plain view . . . .").

Plaintiffs allege that the gun was in the truck and that Ross retrieved the gun, examined it, and then incorrectly reassembled it. (<u>See</u> Compl. ¶ 28.) When all reasonable inferences are taken in the light most favorable to Plaintiff, the Complaint alleges that Ross retrieved the gun from the inside of the cab of the truck. There is no allegation in the Complaint that Ross asked for permission to enter the cab and/or retrieve the gun. Thus, there was no consent to a search.

---

[16] This claim may only refer to the Korns, as there is no allegation that Defendants seized or searched the Vassars's personal property. The Complaint alleges that the truck belonged to *both* John and Michael Korn, but the hunting pouch belonged to John alone. There is no allegation as to who owned the weapon allegedly searched.

- 15 -

Likewise, because the Complaint alleges a complete lack of probable cause or reasonable suspicion, the "automobile exception" to the warrant requirement is not applicable. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.").

Likewise, Defendants searched the gun they found in the truck. By opening and examining the chamber of the rifle, Defendants "obtain[ed] information by physically intruding on a constitutionally protected area . . . ." United States v. Jones, 132 S. Ct. 945, 950 n.3 (2012). Thus, Defendants searched the Korns's personal property without a warrant, consent, or probable cause.

The same is true of the search of John Korn's hunting pouch. The Complaint alleges that Defendants "demanded to inspect John Korn's personal hunting pouch. Before John Korn produced it, Ross brusquely grabbed [the] pouch, unsuccessfully attempting to wrench it away from John Korn's grip. John Korn then opened the pouch and displayed its contents to Ross." (Compl. ¶ 29.) While the facts alleged *could* establish that John Korn consented to the search of his hunting pouch, they could likewise be read to establish that Korn had no option *but* to display his hunting pouch to Defendant Ross. See Bumper v. North Carolina, 391 U.S. 543, 548–49 (1968) (holding that consent cannot be proven "by showing no more than acquiescence to a claim of lawful authority"); Lee v. City of S. Charleston, 668 F. Supp. 2d 763, 773 (S.D.W. Va. 2009) (noting that a suspect who "declined to object" to a search because he believed "he had no choice but to acquiesce because the officer, by his chosen language, had expressed authority to" conduct the search could show that he did not consent to the search). In that instance, the

- 16 -

Case 4:14-cv-00056-JLK-RSB   Document 19   Filed 06/15/15   Page 16 of 20   Pageid#: 150

interpretation that permits the claim to stand must prevail, and Defendants' motion to dismiss should be denied.

On the searches of the automobile, the rifle, and the hunting pouch, at this stage, qualified immunity is not appropriate. As stated above, the allegations in the Complaint are that the officers conducted warrantless searches without probable cause, reasonable suspicion, or consent. By doing so, they transgressed a bright-line rule of the Fourth Amendment of which a reasonable officer would have known. Accord Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1240 (10th Cir. 2003) ("It is well-established that a warrantless search is presumptively unreasonable under the Fourth Amendment and therefore invalid unless it falls within a specific exception to the warrant requirement."); Brooks v. Rothe, 577 F.3d 701, 711 (6th Cir. 2009) (Moore, J., dissenting) ("[I]t is abundantly clear . . . that a warrantless search cannot be conducted in the absence of a warrant exception . . . ."). But see Anderson v. Creighton, 483 U.S. 635, 640–41 (1987) (holding that, although it is firmly established that warrantless searches not subject to a recognized exception violate the Fourth Amendment, the qualified immunity analysis requires more, in that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense."). Thus, at this stage, Defendants are not entitled to protection of qualified immunity.

F. Count II: Defendants Alleged Violation of Va. Code Ann. § 19.2-59

Section 19.2-59 of the Virginia Code states, in part:

> No officer of the law or any other person shall search any place, thing or person, except by virtue of and under a warrant issued by a proper officer. Any officer or other person searching any place, thing or person otherwise than by virtue of and under a search warrant, shall be guilty of malfeasance in office. Any officer or person violating the provisions of this section shall be liable to any person aggrieved thereby in both compensatory and punitive damages.

> . . .
> Provided, however, that any officer empowered to enforce the game laws or marine fisheries laws as set forth in Title 28.2 may without a search warrant enter for the purpose of enforcing such laws, any freight yard or room, passenger depot, baggage room or warehouse, storage room or warehouse, train, baggage car, passenger car, express car, Pullman car or freight car of any common carrier, or any boat, automobile or other vehicle; but nothing in this proviso contained shall be construed to permit a search of any occupied berth or compartment on any passenger car or boat or any baggage, bag, trunk, box or other closed container without a search warrant.

Va. Code Ann. § 19.2-59. "The Virginia statute consistently has been held to provide the same protection as the Fourth Amendment of the Constitution of the United States." Amato v. City of Richmond, 875 F. Supp. 1124, 1143 (E.D. Va. 1994) (citing Carter v. Commonwealth, 209 Va. 317 (1968), cert. denied, 394 U.S. 991 (1969); Burnham v. West, 681 F. Supp. 1169 (E.D. Va. 1988)). For the reasons discussed above, Plaintiffs have stated a Fourth Amendment claim for the Korns's detention, as well as the search of the car, rifle, and pouch. Thus they have stated a claim for a violation of Va. Code Ann. § 19.2-59.

### G. Count III: False Imprisonment

Under Virginia law, "false imprisonment" is defined as "the restraint of one's liberty without any sufficient legal excuse." Lewis v. Kei, 281 Va. 715, 724 (2011) (citing Montgomery Ward & Co. v. Wickline, 188 Va. 485, 489 (1948)). In cases where the claim of false imprisonment arises from a police encounter, "[i]f the plaintiff's arrest was lawful, the plaintiff cannot prevail on a claim of false imprisonment." Id. (citing DeChene v. Smallwood, 226 Va. 475, 481 (1984)). Here, as stated above, and taking the facts in the light most favorable to Plaintiffs, the detention of the Korns was neither lawful nor reasonable. When the facts are viewed under that prism, Plaintiffs have stated a claim for false imprisonment.

H.  Count IV: Trespass and Destruction of Property

"Trespass is the unauthorized use of or entry onto another's property."  Jaynes v. Commonwealth, 276 Va. 443, 459 (2008) (citing Vines v. Branch, 244 Va. 185, 190 (1992); Va. Code Ann. §§ 18.2-119, -125, -128, and -132).  Here, only the Vassars claim a property interest in the Roxobel tract.  As stated above, the § 1983 claims for illegal search of the Roxobel tract and destruction of the fence will be dismissed under Rule 12(b)(6) and on qualified immunity grounds.  That leaves the Vassars asserting only a state-law claim.  Accordingly, I decline to exercise supplemental jurisdiction over claims by plaintiffs whose only remaining claims are state-law claims.  See 28 U.S.C. § 1367(c)(3) (2014).  The trespass claim will be dismissed for lack of jurisdiction.  See Fed. R. Civ. P. 12(b)(1).

## IV.  CONCLUSION

Plaintiffs have stated a claim with respect to: the detention of the Korns; the search of the Korns's car, rifle, and hunting pouch; the violation of Va. Code Ann. § 19.2-59; and false imprisonment.  Because the Fourth Amendment does not protect "open fields," Plaintiffs have not stated a claim for an illegal search of the Roxobel tract, and that claim will be dismissed.  Because the right asserted by the Vassars in relation to the destruction of the gate was not "clearly established," Defendants are entitled to qualified immunity on that claim.  Because the Vassars lack an adequate federal question, their sole remaining claim, a state-law action for trespass, will be dismissed for lack of jurisdiction.  Plaintiffs will be given leave to amend their Complaint, if they so choose.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 15th day of June, 2015.

                                        s/Jackson L. Kiser
                                        SENIOR UNITED STATES DISTRICT JUDGE